IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 18, 2006 Session

## SANDRA BURTON v. KIZZY McCARY

**A Direct Appeal from the Juvenile Court for Madison County**
**No. 35-31, 471    The Honorable Christy R. Little, Judge**

_____

**No. W2005-01695-COA-R3-PT - Filed February 10, 2006**

_____

This is a termination of parental rights case. Mother/Appellant appeals from the order of the Juvenile Court at Madison County terminating her parental rights. Specifically, Appellant asserts that the ground of persistence of conditions is not supported by clear and convincing evidence in the record, and that termination of her parental rights is not in the best interest of the minor child. Because we find clear and convincing evidence in the record to support the trial court's findings, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Lowe Finney of Jackson for Appellant, Kizzy McCary

Lanis L. Karnes of Jackson for Appellee, Sandra Burton

**OPINION**

D.M. was born on August 11, 1997 to Kizzy McCary ( "McCary," or "Appellant"). D.M. was discharged from the newborn nursery at the hospital in good condition. No father was listed on the birth certificate.[1] When D.M. was one week old, she was rehospitalized with seizures. Since that time, D.M. has been diagnosed as developmentally delayed with cerebral palsy, ADHD, possible

_____

[1] During the pendency of these proceedings, McCary asserted that Cullen Deon Moore is D.M.'s father. DNA testing was performed, and Mr. Moore was determined to be the father of D.M. Mr. Moore was present at the November 16, 2004 hearing. At that hearing, Mr. Moore stated that he did not wish to contest the proceeding, and that it was his wish that D.M. remain in the physical custody of Ms. Burton. Mr. Moore's parental rights were terminated by Order of April 5, 2005. He is not a party to this appeal.

autism (with aggression), and herpetic encephalitis.[2] At the time of the hearing in this case (when D.M. was seven years old), Sarah Webb, a nurse who had monitored D.M. since she came into protective custody, testified that D.M.'s mental age was less than one year. D.M. does not communicate through language. She uses sounds, song, facial expressions, and some limited signs. D.M. has no control over her bodily functions and, at age seven, is still in diapers.

In May 2001, McCary was incarcerated for violation of her probation on charges of aggravated assault. While in prison, McCary signed a child custody grant and limited power of attorney granting Renae Young the authority to sign any official paperwork pertaining to the welfare of D.M. This paperwork also granted temporary custody of D.M. to Ms. Young. On August 31, 2001, D.M. was staying with Cynthia Watkins, who had been keeping her during the week. While at Ms. Watkins', D.M. took another child's prescription medication.[3] D.M. was taken to the emergency room and then admitted to the Pediatric Unit. While D.M. was in the hospital, there was a problem with having someone to stay with her in her room, and the child was essentially left in the care of the nursing staff. The hospital was finally able to find sitters to come to the hospital and be with the child during her hospital stay. On or about September 6, 2001, DCS placed D.M. in foster care in the home of Sandra Burton ("Appellee"). D.M. has lived with Ms. Burton since that time.

D.M. receives $561.00 per month in disability. According to McCary's instructions, during her incarcertation, $100.00 of this money was being used to pay Ms. Watkins to watch D.M. during the week. Over $100.00 was being sent to McCary in prison, and over $100.00 was being given to McCary's boyfriend, who was also in prison. Ms. Young stated that she received none of these funds.

On or about September 4, 2001, the State of Tennessee, Department of Children's Services ("DCS") filed a "Petition for Temporary Custody" and an "Affidavit of Reasonable Efforts". On or about September 4, 2001, the trial court entered a "Protective Custody Order". Hearings were held by the trial court on September 7, 2001 and on October 2, 2001. Following each hearing, D.M. was found to be dependent and neglected and was ordered to be kept in DCS' custody.[4] A guardian ad litem was assigned to D.M. A Permanency Plan was developed for D.M. on September 20, 2001 and ratified by the trial court on October 2, 2001. The initial goal of the Permanency Plan was return to parent. McCary was released from prison in December 2001.

The "Periodic Review Summary" of June 24, 2002, indicates a dual goal of return home and relative placement. The Permanency Plan was revised on October 31, 2002 to include the dual goal. On November 4, 2002, the Permanency Plan was again revised. This Plan listed return to parent and adoption as the dual goals. By Order of November 26, 2002, the trial court ratified the revised

---

[2] D.M.'s herpes was most likely contracted, in vitro, from McCary.

[3] The medication D.M. took was two tablets of Zoloft 500 mg., two tablets of Zoloft 100 mg, and 2 ½ tablets of respiradol.

[4] Orders were entered on or about September 13, 2001 and on or about October 5, 2001.

Permanency Plan. In these Permanency Plans, McCrary was granted unsupervised visitation with D.M., which she exercised on the weekends. The "Periodic Review Summary" of December 16, 2002 indicates that McCary was still having difficulty finding stable housing, employment, and transportation. The "Periodic Review Summary" of June 23, 2003 indicates that McCary "has [two] small children and doesn't have the structure that foster mom has." The "Periodic Review Summary" of August 28, 2003 indicates that McCary is cooperating with DCS and other services in completing the requirements of the Permanency Plans. However, the Summary details some concerns with, among other things, D.M. being bruised after visitation with McCary, D.M being returned to Ms. Burton with soiled diapers and clothing, and an allegation that McCary only wanted custody of D.M. in order to get D.M.'s disability check. McCary denied all of these allegations. The Permanency Plan was again revised on November 20, 2003 and included the goal of adoption with an objection by DCS. By Order of February 3, 2004, the trial court ratified this Permanency Plan and set "the goal of adoption over the objection of DCS."

On January 27, 2004, Sandra Burton filed a "Petition to Terminate Parental Rights" of McCary (the "Petition"). An "Amended Petition to Terminate Parental Rights" (the "Amended Petition") was filed on June 10, 2004 in order to add the father to the Petition. The Amended Petition reads, in relevant part, as follows:

> 8. Prior to the filing of this document, Counsel for Petitioner submitted a request from the Putative Father's Registry.
>
> 9. [D.M.] is severely mentally and physically challenged.
>
> 10. [D.M.] is autistic and does not adapt well to changes.
>
> 11. [D.M.] has been in the continuous physical care and control of the Petitioner since 9/4/2001.
>
> *                              *                              *
>
> 17. Pursuant to T.C.A. 36-1-113(g)(4), the Respondent mother has committed child abuse as defined in T.C.A. 37-1-102 against [D.M.]. The mother has knowingly exposed this child to abuse or neglect likely to cause great bodily harm or death to [D.M.].
>
> 18. Pursuant to T.C.A. 36-1-102(1)(A)(i) and (ii) and 36-1-113(g)(8)(A)(ii-vi), the Petitioner submit[s] that grounds for Termination of Parental Rights exist against the mother based on the fact that she has failed to make payments for support of [D.M.] in accordance with the State of Tennessee Child Support Guidelines.... Mother has failed to make reasonable and consistent contacts and visits with [D.M.]. Placing [D.M.] in the mother's legal and physical

-3-

custody would pose a risk of substantial harm to the physical and psychological welfare of [D.M.].

*                                    *                                    *

20. Pursuant to Tennessee Code Annotated section 36-1-113(i)(1-9), the Petitioner avers that it would be in the best interests of the above-named child that the Respondent's parental rights be terminated, because:

a) Respondent has failed to make an adjustment of circumstance, conduct, or conditions as to make it safe and in [D.M.'s] best interest to be in the home of the parents; and/or

b) Respondents have failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible; and /or,

c) Respondents have failed to maintain regular visitation or other contact with the child; and/or

d) Respondents have failed to establish a meaningful relationship between parent and child; and/or

e) Respondents' physical environment is not healthy and safe.

f) Respondents have not paid child support consistent with The Child Support Guidelines at any time during [D.M.'s] custody.

g) It is in the best interest of [D.M.] for continuity of placement.

[21.] In support of [her] petition, Petitioner state[s] as follows:

> a. Mother was on probation.
> b. Mother performed acts of physical violence, slicing a woman's face during a dispute over a man.
> c. These acts caused her probation to be violated.
> d. Mother had to serve time in jail.
> e. Mom left [D.M.] with some "friends", as Mother and her Sister and her Mother were in jail.

*                                    *                                    *

g. While in the care of these "friends" [D.M.] was allowed to get into medicines and swallow them.

h. [D.M.] was rushed to the hospital, where her stomach was pumped.

i. These "friends" left [D.M.] at the hospital, and did not return for her, leaving her without any caretaker.

\*                                  \*                                  \*

l. Kizzy [McCary] is not able to parent her child on a full time basis.

m. [D.M.] wears depends and needs her diaper changed regularly.

n. When she returns home from her visits with her mother, she needs her diaper changed, and has come home with her diaper and pants soaked with urine.

o. [D.M.] takes medication to keep her calm and it must be given regularly.

p. [D.M.] needs consistency to keep her calm.

q. There is no significant bond between [D.M.] and [her] mother, as [D.M.] has been in Petitioner's ca[r]e for about two and a half years.

r. Kizzy McCary has paid no support for [D.M.] whatsoever.

s. [D.M.] was the victim of physical abuse and neglect.

t. Numerous services had been implemented to assist her [McCary] in parenting, yet she still is unable to properly care for her child.

u. Kizzy [McCary] has only a limited knowledge of [D.M.'s] physical or emotional needs.

[22.] Petitioner is a licensed foster parent.

[23.] Petitioner is providing a nurturing and stable environment.

[24.] Petitioner is providing emotional bonds, ethical, emotional, intellectual, and spiritual guidance for [D.M.].

[25.] [D.M.] is well adjusted, healthy, and thriving in this home.

[26.] [D.M.] had bonded with Petitioner and she with her.

[27.] The Petitioner has kept [D.M.] for two and a half years, providing continuity of nurturing, attention, and care during [her] formative years.

[28.] It is crucial to the best interests of [D.M.] to consider the importance of stability and continuity and the subsequent harm that may result from disruption of established patterns of care and emotional bonds.

\*                              \*                              \*

[30.] Petitioner has had [D.M.] more than the statutorily required twelve (12) months pursuant to Tenn. Code Ann. 36-1-115(g)(1) (Supp. 1999) and shall be given first placement for adoption of [D.M.].

On May 18, 2004, and through her assigned counsel, McCary filed her "Response to Petition to Terminate Parental Rights," in which she generally denied the material allegations of the Petition.[5]

The hearing in this case was conducted in three sittings.[6] At the first sitting, on June 22, 2004, there was testimony that D.M. had returned from an unsupervised visit with McCary with bruising on her body. Due to the allegation of physical abuse, the trial court entered an Order on July 6, 2004 granting only supervised visitation to McCary.

At the close of all proof, the trial court made the following ruling from the bench:

This is not a best practices case for DCS. It's one of the worst I've ever seen.

We should have never have forced the foster care mother's hand on this. She should have never had five caseworkers–seven, actually, but five actual if you want to call them case mangers–that worked with this child.

\*                              \*                              \*

And this is a sad state of events because we have failed miserably.

---

[5] McCary filed a "Response to Amended Petition to Terminate Parental Rights" on November 16, 2004.

[6] June 22, 2004, August 3, 2004, and November 16, 2004.

*                                                   *                                                *

And Ms. Preston testified that when she worked–I think she was probably, from what I can tell, the longest caseworker who did seem to put forth the most effort–was seven months from April of '03 to October '03, and her answer to the question–I want to get exactly what the question was so I don't misquote it.

The question was: "At the time–at the time of your involvement do you think Kizzy McCary was capable of raising [D.M.] without harm on a full-time basis?"

And her answer was: "No."

That was October of 2003. This child had been in State custody since September or October of 2001.

*                                                   *                                                *

But I'm going to make the finding that the Department of Children's Services did not do their job in this case. But we are going to do what's best for this child, that the Petitioner has met her burden of proof by [] clear and convincing evidence, not on the grounds of abandonment, because this mother has visited; not on the grounds of substantial noncompliance, because I think she's done the very best she can; but on the grounds the child's been removed from the home for a period of six months.

*                                                   *                                                *

The conditions that led to the removal haven't changed. There's no way that Ms. McCary can take care of this child and the other two that she has.

In not twenty-four hours this child's going to be in the hospital or, God forbid, in the obituaries because she requires constant attention that a mother with two small younger children can't handle.

There's a likelihood these conditions are not–that these conditions will [not] be remedied at an early date. [McCary] does not have a job. Her income is so much less than what's going out.

\*                                    \*                                    \*

        And that, three, that this child deserves a chance of integration into a safe, stable, and permanent home.  She has that now.

        That's the only chance that I see she has to ever–that to ever be able to have any type of success, based on the testimony that was overwhelming at the very beginning by Dr. Wood, by Ms. Hardin, that there is absolutely no way, unless you give your–this child one hundred percent–and even the Department of Children's Services own employee Nurse Webb, who stated, and I quote, "She needs stability and protection."

        There is a bond with Ms. Burton.  The caregiver should be educated.  There were improvements.  She's been a nurse for thirty years.  And the only chance that [D.M.] has for independent living skills are going to be with an advocate and someone who can work with her.  Also, there is clear and convincing evidence that it is in the best interest of the child....

        She–Ms. McCary–lacks the skills and ability to actually protect this child from sexual predators, from day-to-day contact, from day-to-day treatment from doctors, from specialists.

        Continuity of placement is absolutely critical.  This child has been in this home since 2001.  There is a bond–overwhelming bond with the ... foster mother....

        The risk to the two minor children in the home of Ms. McCary is very great.  These children will have injuries if this child is in this home with the other two minor children because her growing aggression, based on her autism.

\*                                    \*                                    \*

        [Ms. McCary has] no car insurance, and the child will be riding around in a vehicle that's [not] insured....

The trial court went on in its ruling from the bench to grant Ms. Burton guardianship of D.M.. However, this ruling made Ms. Burton ineligible for certain funding as a foster parent. Consequently, and by Order of February 22, 2005, the trial court changed guardianship for D.M. back to DCS pending appeal. The "Final Judgment and Termination of Parental Rights" was entered on April 7, 2005.  This Judgment incorporates, by reference, the trial court's findings as set out in

its "Order to Terminate Parental Rights," entered on April 5, 2005.  The relevant findings are as follows:

> 7.  The minor child was released from the hospital after birth as a healthy infant with an uncomplicated delivery.
>
> 8.  The pregnancy itself was complicated by chlamydeous and trichonomas infections.
>
> 9.  The minor child was discharged from the nursery in "good condition."
>
> 10.  The minor child was rehospitalized at one week of age due to seizures and herpetic encephalitis and was hospitalized for three weeks.
>
> 11.  The minor child has been diagnosed as a special needs child.  She has been prescribed anti epileptic meds.
>
> 12.  The minor child's medical problems include: herpes encephalitis, Microcephaly, neuromotor disorder, and autism.
>
> 13.  She is considered profoundly mentally retarded at 4 yr 9 months she functioned at 11 - 12 months, and still functions at that level.
>
> 14.  The minor child's developmental delays require occupational, speech and physical therapy one time a week.
>
> 15.  The minor child's behavioral problems include predominantly extreme over activity.
>
> 16.  The minor child is prescribed these various medicines: adderall to stimulate nerve cells in brain for narcolepsy or attention deficit disorder Clonidine and tigretol.
>
> 17.  The minor child cannot feed herself.
>
> 18.  The minor child can say few words.  She calls her foster parent "momma."
>
> 19.  The minor child has learned to use sign language for these words: stop, no, walk, eat, drink, and more.

20. The minor child can patty cake and she runs well. She walks, often on her toes, but stairs are challenging to her.

21. The minor child is not toilet trained; her diapers cost $134.68 a month.

22. She cannot self-bathe.

23. The minor child cannot sit still for more than a few seconds at a time.

24. The minor child is almost always in constant motion. She paces the room, rocks and almost continuously vocalizes with rhythmic movements with her tongue.

25. The minor child is autistic and does not adapt well to changes.

\*                    \*                    \*

[30]. Petitioner is a licensed foster parent.

[31]. Petitioner is providing a nurturing and stable environment.

[32]. Petitioner is providing emotional bonds, ethical, emotional, intellectual, and spiritual guidance of the minor child.

[33]. The minor child is well adjusted, healthy, and thriving in this home.

[34]. The minor child has bonded with Petitioner and she with her.

[35]. The Petitioner has kept the minor child for over three years, providing a continuity of nurturing, attention, and care during her formularize [sic] years.

[36]. The minor child and the Petitioner are seeing a Counselor who recognizes this bond and the detrimental effect of disruption. It is crucial to the best interests of the minor child to consider the importance of stability and continuity and the subsequent harm that may result from disruption of established patterns of care and emotional bonds.

[37].    There was overwhelming testimony by Counselors, schoolteachers, relatives, social workers, a nurse, and friends who testified that Petitioner has the skills and experience and bonding necessary to raise the Minor child and the birth mother's skills are limited. They testified that the child was doing well in her current foster care placement and that there was limited relationship or bond between Respondents and the child and that it was in the child's best interest that parental rights be terminated.

[38].  Nurse Sara Webb testified that the minor child needs stability and protection.  She testified of the bond between the minor child and the Petitioner.  She explained that the minor child's caretaker must be educated to meet all her needs.

[39].  There was clear and convincing evidence that the Petitioner has extensive education on the special needs of the minor child and extensive experience in dealing with her needs.

[40].  The Court finds that the natural mother lacks the skills and abilities to protect the child.

[41].  The Court finds that the natural mother lacks the skills and abilities to provide the day-to-day care of the minor child.

[42].  The Court finds that the Department of Children's Services Worker, Jill Preston, testified in court years ago that she did not think the natural mother was capable of raising the minor child.  The Court finds that there have been at least five (5) Department of Social Services Case workers on this case, and one who served more than once, all of which pursued different goals for the parties involved.

                    *                    *                    *

[44].  There was clear and convincing evidence that the Petitioner has provided continuity of placement for the minor child for over three years.

[45].   The Court finds that the natural mother has no medical insurance to provide for the child.

[46].  The Court finds that the natural mother has no car insurance to properly, lawfully, and safely transport the minor child.

-11-

[47]. The Court finds that the natural mother has had over three years to prepare for the child, and has no job, and has not supported her child in any way . . . .

[48].Petitioner has had the minor child more than the statutorily required twelve (12) months pursuant to Tenn. Code Ann. 36-1-115(g)(1) (Supp. 1999) to be given first chance at placement for adoption of the minor child.

[49]. Respondents have not paid child support consistent with the Tennessee Child Support Guidelines promulgated by the Department pursuant to Tennessee Code Annotated § 36-6-101 since the child entered foster care.

            \*                \*               \*

[51]. It further appears to the Court that Respondents have not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in his home; that changing caretakers and physical environment would adversely affect the child's psychological and medical condition.

[52]. It further appears to the Court that based on the testimony given, the Petitioner has carried her burden of proof and that there is clear and convincing evidence that it is in the best interest of the child for the respondents' parental rights to be terminated so that an adoption can be pursued. Therefore, this Court find that it is in the child's best interest that the parental rights of Kizzy McCary and Cullen Moore to the minor child be terminated.

[53]. It further appears to the Court that it is in the best interest of the child and the public that all the parental rights of Respondents forever be terminated.

[54]. The grounds have been met for termination of parental rights.

[55]. It is in the best interest to make a determination of the placement of the minor child favoring continuity of placement pursuant to In re: S.B., ET Al, 200 Tenn. App. LEXIS 308 (2000).Ms. McCary appeals and raises two issues for review as stated in her brief:
1. Whether the juvenile court erred in terminating Appellant-Mother's parental rights based on a finding that persistent conditions

-12-

still exist and are unlikely to be remedied in the near future pursuant
to Tennessee Code Annotated § 36-1-113(g)(3)(A); and,

2. Whether termination of Appellant-Mother's parental rights is in
the child's best interest pursuant to Tennessee Code Annotated § 36-
1-113(c)(1).

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R.App. P. 13(d).

T.C.A. § 36-1-113(c)(2005) governs termination of parental rights and requires that such termination be based upon:

(1) A finding by the court by clear and convincing evidence that the
grounds for termination of parental or guardianship rights have been
established; and
(2) That termination of the parent's or guardian's rights is in the best
interest of the child.

The standard for the termination of parental rights is well settled. The United States Supreme Court has recognized the important nature of cases involving the termination of parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties ." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745 (1982) (Rehnquist, J., dissenting)). Accordingly, "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id*. The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *See O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn.Ct.App.1995) (rev'd on other grounds, *In re: Swanson*, 2 S.W.3d 180 (Tenn.1999)).

As a safeguard, courts are required to apply the heightened "clear and convincing" proof standard. *See Santosky*, 455 U.S. at 769; *O'Daniel*, 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1) (2005); *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn.Ct.App.1996). Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn.Ct.App.1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn.Ct.App.1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the

fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. ***O'Daniel v. Messier***, 905 S.W.2d at 188; ***Wiltcher v. Bradley***, 708 S.W .2d 407, 411 (Tenn.Ct.App.1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. ***Lettner v. Plummer***, 559 S.W.2d 785, 787 (Tenn.1977); ***Goldsmith v. Roberts***, 622 S.W.2d 438, 441 (Tenn.Ct.App.1981); ***Brandon v. Wright***, 838 S.W.2d at 536.

## Grounds for Termination

The trial court terminated McCary's parental rights on the ground of persistence of conditions, which is codified at T.C.A. § 36-1-113(g)(3)(A)(2005):

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
>> (i) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>>
>> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>>
>> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

We have reviewed the entire record in this case, and we find that there is clear and convincing evidence to support the trial court's finding on persistence of conditions. The gravamen of persistence of conditions in this case is stability in McCary's household. The evidence is overwhelming that stability is absolutely imperative in order for D.M. to thrive. The record indicates that D.M. needs constant supervision, and a great deal of one-on-one interaction. Furthermore, D.M. should not be left unsupervised with the two younger children in McCary's household because D.M.'s autism makes her aggressive toward others. Given the extent of D.M.'s mental, emotional, and behavioral problems, there is little likelihood that she will ever be able to live independently. Although McCary has cooperated with DCS in completing the goals of the permanency plans, and has exercised visitation with D.M., she has been unable to procure stable employment. By her own

testimony, McCary's limited income does not begin to cover her monthly expenses. Consequently, she is dependent upon extended family members to make ends meet. Such a precarious financial condition does not bode well for long-term stability in the McCary household. Furthermore, even if McCary is able to procure adequate employment, she has no set plan for who will take care of D.M. while McCary is working. Lois Carroll, the grandmother of McCary's other children, testified that she would be willing to help McCary care for D.M.; however, there is no indication that Ms. Carroll has the skills necessary to cope with a child such as D.M. If McCary finds employment, it seems likely that she will be in a situation similar to the one that existed at the time she was sent to jail. When McCary went to jail, D.M. was shuffled from home to home and was ultimately taken into DCS custody when she ingested prescription medications in the home of one of these caretakers. Such a scenario is unacceptable for any child, much less one with such special needs as D.M.

In addition, the record indicates that D.M. has acted out aggressively with both adults and children. To place D.M. in the McCary household with the two younger children would be to place those children in jeopardy. However, even if there were no other children to consider and McCary was living in a stable environment, there is no indication in the record that McCary fully grasps the extent of D.M.'s needs. Although D.M. had been removed from McCary's custody for over three years (at the time the hearing concluded), the record indicates that McCary would still need further training in order to deal with D.M. on a daily basis. Although she has participated in some basic parental training through the Carl Perkins' Center, the record indicates that McCary would need in-depth training in order for D.M. to be properly cared for in her custody. The record supports, by clear and convincing evidence, the trial court's finding that conditions are such that D.M. would be subjected to further harm, abuse and/or neglect if placed in the care and custody of McCary. Given D.M.'s limitations and the fact that McCary has not been able to maintain employment and has not participated in (or sought out) the additional training necessary to care for this child, there is little probability that these conditions will be remedied at any time in the near future.

## Best Interest

After a finding that the grounds for termination have been established by clear and convincing evidence, the court must then determine if termination is in the best interests of the child. T.C.A. § 36-1-113(c)(2). Section 36-1-113(i) (2005) enumerates the following factors courts are to consider in making the best interests determination:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 Tenn.App. LEXIS 340, at *9 (Tenn. Ct. App. May 10, 2002). Nonetheless, these factors must be considered in light of the situation as it pertains to D.M. As discussed above, D.M. is a special needs child who has specific learning, emotional, and behavioral problems. All reports indicate that D.M. is in need of continued counseling, therapy, and supervision. Under the current arrangement, D.M. resides in a therapeutic foster home under the care of a trained foster parent. Ms. Burton has the specialized training necessary to provide adequate support for D.M. Consequently, this foster home has served as a stable and supportive environment for the minor child for over three years at the time of the hearing. In addition to the care D.M. receives from her foster mother, she is enrolled in a local school where she benefits from a special education curriculum. Because stability is so paramount with this child, the record indicates that, following weekend visitation with McCary, it takes about three days for the school staff to get D.M. focused and calmed enough to work with her. All of D.M.'s teachers testified about the bond that

D.M. has developed with Ms. Burton. The care, supervision, and training provided in the foster home and school programs has created a stable home environment that serves as an emotional anchor for this child. Furthermore, Ms. Burton has indicated her desire to adopt D.M. It is this Court's concern that any change in environment would so disrupt D.M.'s life that she might not recover.

From the record, there is no doubt that caring for D.M. is more than a full-time job. Despite the reasonable efforts made by DCS, in the more than three years since D.M. came into DCS custody, McCary has not been able to procure permanent employment. She has provided no financial support for D.M. since the child came into DCS' custody. McCary has not participated in advanced training on how to cope with D.M.'s specific needs, and she has not been able to set up a support network that would be able to safely care for D.M. when McCary is temporarily unavailable. From the evidence before us, we cannot say that the trial court erred in finding that there is clear and convincing evidence that termination of McCary's parental rights is in the best interest of this child.

For the foregoing reasons, we affirm the Final Order of the trial court terminating McCary's parental rights to D.M. Costs of this appeal are assessed against the Appellant, Kizzy McCary, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.